James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Tel: (973) 994-1700

*Counsel for Plaintiffs*

Blair A. Nicholas (*pro hac vice*)
Jonathan D. Uslaner (*pro hac vice*)
David R. Kaplan (*pro hac vice*)
Brandon Marsh (*pro hac vice*)
BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW JERSEY

| | |
|---|---|
| T. ROWE PRICE GROWTH STOCK FUND, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER, ROBERT L. ROSIELLO, DEBORAH JORN, ARI S. KELLEN, and TANYA CARRO, <br><br> Defendants. | Civil Action No. 16-cv-5034-MAS-LHG <br><br> **PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| EQUITY TRUSTEES LIMITED AS RESPONSIBLE ENTITY FOR T. ROWE PRICE GLOBAL EQUITY FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER, ROBERT L. ROSIELLO, DEBORAH JORN, ARI S. KELLEN, and TANYA CARRO, <br><br> Defendants. | Civil Action No. 16-cv-6127-MAS-LHG |

| | |
|---|---|
| PRINCIPAL FUNDS, INC. and PRINCIPAL VARIABLE CONTRACTS FUNDS, INC., et al., | Civil Action No. 16-cv-6128-MAS-LHG |
| Plaintiffs, | |
| v. | |
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER, ROBERT L. ROSIELLO, DEBORAH JORN, ARI S. KELLEN, and TANYA CARRO, | |
| Defendants. | |
| BLOOMBERGSEN PARTNERS FUND LP and BLOOMBERGSEN MASTER FUND LP, et al., | Civil Action No. 16-cv-7212-MAS-LHG |
| Plaintiffs, | |
| v. | |
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER, ROBERT L. ROSIELLO, DEBORAH JORN, ARI S. KELLEN, and TANYA CARRO, | |
| Defendants. | |

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF AUTHORITIES ............................................................................ ii

I.      PRELIMINARY STATEMENT ........................................................... 1

II.     BACKGROUND ................................................................................ 3

III.    ARGUMENT ..................................................................................... 8

     A.   Defendants' Recycled "Truth-On-The-Market" Defense Fails ............................ 8

     B.   Defendants' Challenges To The Section 18 Claims Fail ...................................... 15

     C.   Defendants' Additional Challenge To The BloombergSen
         Plaintiffs' Section 18 Claims Fails ........................................ 18

     D.   Defendant Schiller's Duplicative Arguments Fail ................................................. 19

     E.   Defendant Carro's Duplicative Arguments Fail ................................................... 22

         1.   Defendant Carro's Challenges To Falsity Fail........................................ 22

         2.   Defendant Carro's Challenges To Scienter Fail ..................................... 25

     F.   Defendant Jorn's Duplicative Argument Fails ..................................................... 27

IV.     CONCLUSION.................................................................................. 29

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Able Labs Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008)...................................................................2, 15, 16

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)...................................................................................25, 28, 29

*Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*,
  315 F. Supp. 2d 666 (E.D. Pa. 2004) ..................................................................................16

*In re Bio-Tech. Gen. Corp. Sec. Litig.*,
  380 F. Supp. 2d 574 (D.N.J. 2005) ....................................................................................27

*In re Bradley Pharms., Inc. Sec. Litig.*,
  421 F. Supp. 2d 822 (D.N.J. 2006) ...............................................................................10, 12

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ....................................................................................25

*In re Cigna Corp. Sec. Litig.*,
  459 F. Supp. 2d 338 (E.D. Pa. 2006) .................................................................................11

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
  686 F. Supp. 2d 404 (D. Del. 2009)....................................................................................22

*Dexia SA/NV v. Deutsche Bank AG*,
  2013 WL 98063 (S.D.N.Y. Jan. 4, 2013) ...........................................................................19

*In re Discovery Labs. Sec. Litig.*,
  2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) .......................................................................14

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)............................................................................................................12

*In re DVI, Inc. Sec. Litig.*,
  2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ..................................................................11, 13

*In re: Enzymotec Sec. Litig.*,
  2015 WL 8784065 (D.N.J. Dec. 15, 2015)............................................................................9

*Gannon v. Cont'l Ins. Co.*,
  920 F. Supp. 566 (D.N.J. 1996) .........................................................................................19

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) .........................................................................................10, 24

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
  2017 WL 1536223 (D.N.J. Apr. 27, 2017) .............................................................29

*Inst'l Inv'rs Grp. v. Avaya*,
  564 F.3d 242 (3d Cir. 2009) ................................................................................27

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) .......................................................................................23, 24

*Lovallo v. Pacira Pharms., Inc.*,
  2015 WL 7300492 (D.N.J. Nov. 18, 2015) ...........................................................14

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..............................................................................................22

*Maverick Fund, L.D.C. v. Comverse Tech.*,
  801 F. Supp. 2d 41 (E.D.N.Y. 2011) ..............................................................17, 18

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
  2011 WL 3444199 (D.N.J. Aug. 8, 2011) ..................................................... passim

*In re Merck & Co. Inc. Sec. Derivative & ERISA Litig.*,
  2013 WL 2395035 (D.N.J. May 29, 2013) .............................................................24

*In re Merck & Co., Inc. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005) ................................................................................14

*In re Milestone Sci. Sec. Litig.*,
  103 F. Supp. 2d 425 (D.N.J. 2000) .....................................................................27

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) .....................................................................27

*Payne v. DeLuca*,
  433 F. Supp. 2d 547 (W.D. Pa. 2006) ....................................................................9

*Pension Comm. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  592 F. Supp. 2d 608 (S.D.N.Y. 2009) ..................................................................19

*In re Petrobras Sec. Litig.*,
  150 F. Supp. 3d 337 (S.D.N.Y. 2015) ....................................................................9

*In re Petrobras Sec. Litig.*,
  152 F. Supp. 3d 186 (S.D.N.Y. 2016) ..................................................................17

*In re Pfizer Inc. Sec. Litig.*,
  2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) .........................................................24

*In re Res. Am. Sec. Litig.*,
   2000 WL 1053861 (E.D. Pa. July 26, 2000) .................................................................9

*In re Schering-Plough Corp./Enhance Sec. Litig.*,
   2009 WL 2855457 (D.N.J. Sept. 2, 2009) .................................................................22

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000).................................................................................14

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006).................................................................15, 16, 17

*Swack v. Credit Suisse First Boston*,
   383 F. Supp. 2d 223 (D. Mass. 2004) .................................................................9

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).................................................................................21, 25

*In re Tellium, Inc. Sec. Litig.*,
   2005 WL 2090254 (D.N.J. Aug. 26, 2005) .................................................................11

*Transit Rail, LLC v. Marsala*,
   2007 WL 2089273 (W.D.N.Y. July 20, 2007).................................................................17

*In re Urban Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) .................................................................11

*In re Valeant Pharms. Int'l Inc. Sec. Litig.*
   2017 WL 1658822 (D.N.J. Apr. 28, 2017) .................................................................3

*Witriol v. Conexant Sys. Inc.*,
   2006 WL 3511155 (D.N.J. Dec. 4, 2006) .................................................................17

*WM High Yield Fund v. O'Hanlon*,
   2005 WL 6788446 (E.D. Pa. May 13, 2005) .................................................................16, 21

*Zazzali v. Alexander Partners, LLC*,
   2013 WL 5416871 (D. Del. Sept. 25, 2013) .................................................................16

**STATUTES, RULES & REGULATIONS**

15 U.S.C. § 78u-4(b)(1) .................................................................................22

Exchange Act
   Section 10(b).................................................................................8, 9
   Section 18.................................................................................passim
   Section 20(a) .................................................................................8

Federal Rules Of Civil Procedure

Rule 9(b) ................................................................................................................16
Rule 15 ...................................................................................................................29

Plaintiffs in the above-captioned actions (collectively, "Plaintiffs" or "Direct Action Plaintiffs") respectfully submit this omnibus memorandum of law in opposition to Defendants' Motions to Dismiss the Direct Action Complaints.[1]

## I.    PRELIMINARY STATEMENT

Defendants' motions are almost entirely a rehash of the same arguments that they made and lost at the pleading stage in the related securities class action case, *In re Valeant Pharmaceuticals International, Inc. Securities Litigation*, No. 15-cv-07658-MAS-LHG (D.N.J.) (the "Class Case"). Here, as in the Class Case, Plaintiffs have adequately pled all elements of their claims, and each of Defendants' challenges fails.

In their motions, Defendants repeat their Class Case arguments that, at this early stage in the proceedings and without any discovery, the Court should rule that the fraud was fully revealed, *i.e.*, "the truth was on the market," by October 30, 2015. There is no support for Defendants' counterfactual arguments, and no reason for the Court to depart from its prior, well-reasoned decision rejecting this argument in the Class Case. Defendants' attempt to have the Court rule as

---

[1] "Defendants" herein refers to moving Defendants Valeant Pharmaceuticals International, Inc. ("Valeant"), Robert L. Rosiello ("Rosiello"), Ari S. Kellen ("Kellen"), J. Michael Pearson ("Pearson"), Howard B. Schiller ("Schiller"), Tanya Carro ("Carro"), and Deborah Jorn ("Jorn"). Defendants filed numerous overlapping, duplicative motions to dismiss (the "Motions to Dismiss") the individual complaints (the "Direct Action Complaints"). The Motions to Dismiss were filed as ECF Nos. 34-38 in *T. Rowe Price Growth Stock Fund, Inc., et al. v. Valeant Pharmaceuticals International, Inc., et al.*, Case No. 16-cv-05034-MAS-LHG ("T. Rowe"); ECF Nos. 33, 35-38 in *Equity Trustees Limited as Responsible Entity for T. Rowe Price Global Equity Fund, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, Case No. 16-cv-06127-MAS-LHG ("Equity Trustees"); ECF Nos. 32, 34-37 in *Principal Funds, Inc., et al. v. Valeant Pharmaceuticals International, Inc., et al.*, Case No. 16-cv-06128-MAS-LHG ("Principal Funds"); and ECF Nos. 33-37 in *BloombergSen Partners Fund LP, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, Case No. 16-cv-07212-MAS-LHG ("BloombergSen"). The Motions to Dismiss are referred to herein as "Valeant Motion," "Schiller Motion," "Carro Motion," and "Jorn Motion."

a matter of law at the pleading stage on the falsity and loss causation elements of Plaintiffs' claims is premature and fails for the same reasons that it failed in the Class Case.

In their motions, Defendants Schiller, Carro, and Jorn similarly reiterate the same arguments that the Court considered and rejected in the Class Case. These Defendants contend, largely rearguing verbatim their Class Case motions to dismiss, that the allegations of their false and misleading statements and scienter are purportedly insufficient. Given that the Class Case and the Direct Action Complaints contain the same operative allegations, these Defendants' motions should be denied for the same reasons they were denied in the Class Case. As explained further below, the Direct Action Complaints more than amply allege that these Defendants made false and misleading statements and omissions, as well as raise a strong inference of their scienter.

Defendants concede in their motions that Plaintiffs have adequately pled all elements of their claims under Section 18 of the Exchange Act, with the lone exception of the element of "reliance." Contrary to Defendants' suggestion, Plaintiffs' Section 18 reliance allegations are detailed, identifying the specific misstatements and omissions on which Plaintiffs actually relied, as well as who made the investment decisions for each of the Plaintiffs. The Direct Action Complaints provide further facts about the investment approach used by the Plaintiffs, including, for example, whether Plaintiffs "employed an active strategy based on an analytical, research-based investment process." The Complaints also specifically state that Plaintiffs and their investment advisors read the 2013 and 2014 Forms 10-K at issue on or about February 28, 2014, and February 25, 2015, respectively, and relied upon the false and misleading statements that are specifically identified in the Direct Action Complaints when making their investment decisions. Plaintiffs have amply alleged reliance under Section 18. *See In re Able Labs Sec. Litig.*, 2008 WL 1967509, at *26 (D.N.J. Mar. 24, 2008) (explaining that, for Section 18 claims, it is sufficient to

allege "the statement[s that] were read and relied upon in connection with the purchase of [defendant's] securities").

Defendants also attempt a statute-of-repose challenge to the BloombergSen Plaintiffs' Section 18 claims, but their attempt rests on a misreading of the BloombergSen Plaintiffs' Complaint. The BloombergSen Plaintiffs purchased the Valeant securities related to their Section 18 claims *after* Defendants' filing of the 2014 Form 10-K on February 25, 2015 – not in January 2013, as Defendants claim. Because the BloombergSen Plaintiffs filed suit on October 13, 2016, well within three years of the misstatements, their claims are timely under Section 18's statute of repose.

Defendants' motions to dismiss should be denied in their entireties.

## II.  **BACKGROUND**

The Court is well-versed in the underlying facts set forth in the Direct Action Complaints, which are substantially similar to those detailed in the Class Action Complaint that was largely sustained by the Court in its April 28, 2017 "Memorandum Opinion" and Order (the "Order"). *In re Valeant Pharms. Int'l Inc. Sec. Litig.*, No. 15-cv-7658-MAS-LHG, ECF No. 216 at 3-17, *available at* 2017 WL 1658822 (D.N.J. Apr. 28, 2017).

Prior to and during the Relevant Period (January 4, 2013 to August 10, 2016), Defendants' strategy was to grow Valeant through acquisitions as opposed to research and development.[2]  As part of the growth-by-acquisitions strategy, after Valeant acquired drugs developed by other companies, Valeant massively increased the prices of those drugs and drove sales through a variety

---

[2] ¶¶2-3. "¶__" citations herein refer to paragraphs in the Equity Trustees Complaint, Case No. 16-cv-06127-MAS-LHG, ECF No. 1.  Appendix A, attached hereto, lists corresponding paragraph references in the other three Direct Action Complaints.  In this brief, all emphasis is added and all internal citations and punctuation are omitted, unless otherwise noted.  All defined terms herein shall have the same definitions as set forth in the Equity Trustees Complaint.

of deceptive and unlawful practices.  ¶¶3, 8-12.  One of the deceptive practices was price gouging. Valeant focused its efforts on buying older, neglected drugs – so-called "orphan drugs" that treat rare medical conditions and face little or no competition – and turning them into "specialty drugs" with exorbitant prices.  *Id*.  Valeant also acquired several dermatology drugs during the Relevant Period and increased the prices between 200-250%.  ¶¶3, 107.  Likewise, Valeant increased the prices of two drugs used to treat emergency heart conditions by 212% and 525% on the same day the Company acquired the rights to sell them.  ¶3.

To facilitate its price gouging strategy, Valeant created an undisclosed network of specialty pharmacies, of which Philidor was a central part.  ¶¶8-9.  Through Philidor and the secret pharmacy network, Defendants were able to raise the prices of Valeant drugs while avoiding scrutiny. Defendants also used the pharmacy network to boost sales and revenues for Valeant's branded drugs through a variety of deceptive and illegal practices, including altering prescriptions, unnecessarily refilling prescriptions without authorization, serial copay waivers, misrepresenting the identity of the pharmacies and submitting false information to payors.  ¶¶10-12, 57.

The true facts about Philidor and Defendants' illegal conduct have come to light through a series of disclosures and revelations between September 2015 and August 2016.  *See* ¶¶259-329, 442-72.  For example, on February 22, 2016 – approximately three months after Valeant's largest shareholder, Bill Ackman of Pershing Square, demanded that Valeant management "come clean" about Philidor – the Company announced it would restate its 2014 earnings by over $58 million. ¶¶309-10, 454.  The Company disclosed that the restatement would reduce its 2014 earnings per share by approximately $0.10, and delayed filing its 2015 Form 10-K pending completion of related accounting matters.  ¶¶309-10.  Valeant further disclosed that the financial restatement was necessitated because the Company had been improperly recognizing revenue associated with

Philidor, by prematurely booking revenue upon the delivery of products to Philidor, instead of when the products were dispensed to patients.  ¶¶309-10.

Six days later, on February 28, 2016, Valeant announced it was withdrawing its prior financial guidance and would not be filing its 2015 10-K until it had completed its review of certain accounting matters.  ¶311.  Valeant further reported that it had previously received a subpoena from the SEC and was under investigation for securities laws violations.  ¶463.  Thereafter, Valeant continued to issue disclosures further revealing how the Company's financial performance relied on Philidor and the secret pharmacy network, price gouging, and Valeant's other deceptive practices.  ¶¶465-68.  Following each of these revelations, as well as the others detailed in the Direct Action Complaints, Valeant's stock price dropped by substantial amounts – including declines of between 10-50% – and investors, including Plaintiffs here, suffered greatly.  ¶¶442-72.

Defendants knew – or were, at a minimum, reckless in not knowing – of the true facts when they made their misleading statements and omitted material facts during the Relevant Period.  *E.g.*, ¶¶360-441.  These Defendants include Defendants Schiller, Jorn and Carro, who have moved to dismiss the Direct Action Complaints on the same grounds that they unsuccessfully moved to dismiss the Class Action Complaint.  *Compare* Order at 19-25 *with* Schiller Motion at 1, Jorn Motion at 4-5, *and* Carro Motion at 5-17.

Defendant Schiller, Valeant's CFO and Executive Vice President, made key financial decisions on behalf of Valeant.  ¶36.  Schiller signed all of Valeant's quarterly and annual reports prior to 2Q15, including the Company's 2013 and 2014 Forms 10-K, and SOX certifications.  ¶¶160, 174, 208.  Defendant Schiller, along with Defendant Pearson, touted the Company's innovative non-traditional acquisitions strategy as driving growth for the Company, withholding from investors the truth regarding Valeant's business practices.  *See, e.g.*, ¶¶164, 365.  For instance,

Schiller, alongside the other Defendants, gave a slide presentation in response to Philidor disclosures that stated that, "[w]e do not own or control Philidor," "Philidor employees do not report to Valeant," and "Philidor is independent."  ¶246.

Defendants Jorn and Carro were closely associated with Philidor.  Defendant Carro was at all times Valeant's Corporate Controller.  ¶40.  Defendant Carro oversaw Valeant's accounting practices, booked revenues, and certified financial figures associated with Philidor's operations and sales.  ¶¶385, 391, 393.  Defendant Carro and Valeant's other top executives also publicly defended Valeant's accounting figures.  ¶¶135-36, 246.  For example, when an analyst report dated September 28, 2015 questioned whether Valeant was inflating revenue through Philidor, Defendant Carro, along with Defendant Pearson, publicly defended Valeant's accounting.  ¶¶383, 385.  Specifically, Defendant Carro served as an "expert accountant" to establish credibility for the other Defendants' denials of the claims and defended the Company's accounting practices as purportedly lawful.  ¶385.  Further, investors were assured that the entire Board and Audit Committee, including Defendant Carro, purportedly reviewed and confirmed the appropriateness of the Company's accounting relating to Philidor.  ¶136.

Defendant Carro was also present at the October 26, 2015 investor conference, in which she delivered the Company's slide presentation with the other Valeant executives.  ¶383.  The slide presentation misleadingly assured investors that "[p]rescriptions through Philidor" were supposedly "less profitable than traditional channels due to lower copay rates, lower cash rates, and more cash pay scripts in Philidor than in retail and other channels."  ¶¶246, 250.  During the October 26, 2015 investor conference, Defendant Carro further assured investors that, as of year-end 2014, "Philidor is not considered to be material to Valeant's business for reporting purposes" and that, for the first two quarters of 2015, Philidor "had not been material to the consolidated

financial statements."  ¶250.  On March 21, 2016, Valeant announced that Defendant Carro had been placed on administrative leave in the light of the Company's accounting restatement, and what the Company described as her "improper conduct."  ¶¶318, 391.  As investors would later learn, Defendant Carro's statements during the October 26, 2015 presentation were false, misleading and omitted material facts.

Defendant Jorn, the head of Valeant's U.S. Gastrointestinal and Dermatology Divisions, was directly responsible for some of Valeant's top-selling drugs, including Jublia, a dermatology drug which was sold in immense quantities through Philidor.  ¶¶14, 38, 414.  Through that role, Defendant Jorn had first-hand knowledge of Philidor and Valeant's secret network of controlled pharmacies.  ¶185.  Defendant Jorn was also specifically involved in many of the copay practices that Valeant relied upon to increase sales and drug prices through its undisclosed and illicit practices.  ¶¶129-30.  Moreover, Defendant Jorn was directly responsible for restoring the profitability of several of Valeant's dermatology products previously plagued by weak sales.  ¶185.  As part of these efforts, Defendant Jorn met with Defendant Kellen and district managers to promote Philidor's growth.  In an email to Defendant Pearson, Jorn discussed holding a meeting with district managers to go over practices in each district where Philidor "is working well" and identify certain practices where Philidor's profitability should be improved.  ¶377.  On or about March 2, 2016, it was reported that Defendant Jorn was "leaving the company effective immediately."  ¶414.

As the truth slowly began to emerge, investors filed class action and individual complaints under the federal securities laws seeking substantial damages from Valeant's fraud.  On June 24, 2016, the plaintiffs in the Class Case filed the Class Action Complaint, which alleged, among others, violations of Section 10(b) of the Exchange Act and Rule 10b-5, and Section 20(a) of the

Exchange Act. *Valeant*, Case No. 15-cv-7658-MAS-LHG, ECF No. 80 ("Class Action Complaint"). On April 28, 2017, the Court issued its Order denying Defendants' motions to dismiss the Exchange Act claims in their entirety. Order at 19.

Between August 15, 2016, and October 13, 2016, the Direct Action Plaintiffs filed related actions asserting the same claims that the Court sustained, as well as claims under Section 18(a) based on their direct reliance on the Company's year-end audited financial statements. The parties agreed to a stipulation to defer the time to respond to the Direct Action Complaints until after resolution of the motions to dismiss in the Class Case because, as defense counsel acknowledged, the Direct Action Complaints "assert individual federal securities claims against Defendants that are similar to those asserted in the [Class Case]" and the parties here sought to avoid "duplicative motion practice."[3] Nevertheless, Defendants filed the instant Motions to Dismiss, which largely duplicate arguments already made, and rejected, by the Court in the Class Case.

## III.   ARGUMENT

### A.   Defendants' Recycled "Truth-On-The-Market" Defense Fails

Defendants first rehash their loss causation arguments that already failed at the pleading stage in the Class Case.[4] By way of background, Defendants argued in the Class Case that loss causation was inadequately pled for corrective disclosure dates after October 30, 2015 because, on those later dates, according to Defendants, the disclosures were merely of "previously disclosed facts, not a correction of alleged misstatements or omissions."[5] Here, Defendants attempt the same

---

[3] "Letter Enclosing Stipulation and Proposed Order Regarding Complaint Service and Responses," *Principal Funds*, Case No. 3:16-cv-06128-MAS-LHG, ECF No. 9 (Oct. 4, 2016).

[4] *See* Valeant Motion at 12-15.

[5] *See* "Notice of Motion to Dismiss Complaint" and "Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Complaint," *Valeant*, Case No. 15-cv-07658-MAS-LHG, ECF No. 167 (Sept. 13, 2016) ("Valeant Class Motion"), at 30, 62; *see also*

argument, contending that the Court should bar claims based on purchases made after October 30, 2015, because their fraudulent conduct was purportedly fully disclosed by that date, *i.e.*, the truth was "on the market."  Valeant Motion at 12-15.  These recycled arguments bearing on falsity and loss causation – now under the guise of a "truth-on-the-market" defense – remain unavailing at the pleading stage.

As courts in this Circuit recognize, just like "loss causation," the "truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint" at the pleading stage.  *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015); *see Payne v. DeLuca*, 433 F. Supp. 2d 547, 559 (W.D. Pa. 2006) (same); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 238 (D. Mass. 2004) (rejecting truth-on-the-market defense where "the market knew of general problems, but not the nature or extent"); *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 343 (S.D.N.Y. 2015) (rejecting defendants' argument that plaintiffs' fraud-on-the-market theory cannot extend past March 27, 2015 as "fact-based and not cognizable on a motion to dismiss").  In order to prevail on a truth-on-the-market defense on a motion to dismiss, "defendants must establish that defense as a matter of law on the basis of the allegations." *Enzymotec*, 2015 WL 8784065, at *16.  Further, "before the truth on the market defense can be applied, the defendants must prove that the information that was allegedly withheld or misrepresented was 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by defendant's statements.'"  *In re Res. Am. Sec. Litig.*, 2000 WL 1053861, at *4 (E.D. Pa. July 26, 2000).  Defendants have not, and cannot, bear their heavy burden at this stage.

---

"Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss," *Valeant*, Case No. 15-cv-07658-MAS-LHG, ECF No. 178 (Nov. 14, 2016), at 111-18 ("Class Opposition.").

As noted, Defendants have already raised, and the Court has rejected, the notion that "the 'truth was revealed' by no later than October 30, 2015." In moving to dismiss the Class Action Complaint, Defendants contended that the truth was "fully disclosed by October 30, 2015." Valeant Class Motion at 62. They further asserted, as they do again here, that the subsequent revelations after October 30, 2015 "simply repeated previously disclosed information," and that, accordingly, Plaintiffs supposedly failed to adequately allege that the corrective disclosures caused their losses. *Id*. at 8. The Court rejected Defendants' loss causation arguments, explaining that "[u]pon review of the parties' submissions and the allegations set forth in the Complaint, the Court finds that Plaintiffs have sufficiently pled loss causation" and that "Plaintiffs have sufficiently pled their claims." Order at 24-25.

The same result is appropriate here, as the Direct Action Complaints contain the same well-pled allegations. Courts have consistently held that a corrective disclosure does not need to take the "form of a single, unitary disclosure," but rather, as here, may "occur[] through a series of disclosing events." *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006); *see also, e.g.*, *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2011 WL 3444199, at *31 (D.N.J. Aug. 8, 2011) ("plaintiffs had adequately pled loss causation by alleging multiple disclosures, each of which partially revealed the truth"). In other words, "[t]he exposure of the alleged fraud need not occur in a single, all-encompassing corrective disclosure." *Id.* Indeed, a requirement to the contrary "would be at odds with *Dura* in that it would essentially allow wrongdoers to immunize themselves with a protracted series of partial disclosures." *Id.*; *see also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015) ("[T]he Supreme Court has generally recognized that the truth can leak out over time. So have we.").

A corrective disclosure also does not need to mirror the earlier misrepresentation. *Merck*, 2011 WL 3444199, at *32; *In re Urban Outfitters, Inc. Sec. Litig*., 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015) ("there is no requirement that the disclosure mirror the earlier misrepresentation"); *see also In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010) ("to be corrective, the disclosure need not precisely mirror the earlier misrepresentation").  Indeed, loss causation is established, even without a "corrective disclosure," where a concealed risk created by the fraud materializes.  *See, e.g.*, *In re Cigna Corp. Sec. Litig*., 459 F. Supp. 2d 338, 349 n.22 (E.D. Pa. 2006) (explaining that a plaintiff need only "show that the market reacted negatively to either a corrective event or disclosure or a materialization of the concealed risk").  A plaintiff must only allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at *3 (D.N.J. Aug. 26, 2005).

Moreover, corrective disclosures may take *any* form and can originate from *any* source: "the market may learn the truth regarding the misrepresentation from 'whistleblowers, analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals,' and other informers who are otherwise not representatives of the company or the company itself." *Urban Outfitters*, 103 F. Supp. 3d at 656.

Here, the truth about Valeant's fraudulent practices was revealed through a series of partial, corrective disclosures, including after October 30, 2015.  Examples of the subsequent revelations readily disprove Defendants' assertion that "the 'truth was revealed' by no later than October 30, 2015."  For example, on February 22, 2016, it was first revealed that Valeant was restating its 2014

earnings by over $58 million, and would delay filing its 2015 Form 10-K. It was further disclosed for the first time that Valeant had been improperly recognizing revenue associated with Philidor. ¶462. In response to this news – which was not known to investors prior to October 30, 2015 – the price of Valeant's stock dropped by over 10% in one trading day. Analysts correctly attributed the drop to these revelations at the time. *Id*.

Six days later, on February 28, 2016, it was further revealed to investors that Valeant was withdrawing its prior financial guidance and would not be filing its 2015 Form 10-K until it had completed its review of certain accounting matters "and the Company's ongoing assessment of the impact on financial reporting and internal controls." ¶¶462-63. It was also revealed that Valeant had previously received a subpoena from the SEC and was now under investigation for violation of the securities laws. ¶463. In response to this additional news, Valeant's stock dropped by a further 18% in one trading day. ¶464. These and the additional, new disclosures detailed in the Direct Action Complaints revealed to investors further facts regarding, among other things, the extent of Valeant's fraudulent accounting practices and the effects of Philidor's closure. *See, e.g.*, ¶¶333-59; *see also Bradley Pharms.*, 421 F. Supp. 2d at 829 ("As Plaintiffs have alleged that the price of [Defendants'] stock dropped after the truth regarding Defendants' alleged misrepresentations became known, this Court finds that they have pled, at this stage of the litigation, sufficient facts to satisfy the loss causation requirement and to provide Defendants 'with some indication of the loss and the causal connection that [they have] in mind.'") (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).

The above disclosures detailed in the Direct Action Complaints alone satisfy the loss causation requirement and belie Defendants' purported "truth-on-the-market" defense at this early stage. Defendants' truth-on-the-market contentions are further undercut because, after October

30, 2015, former Valeant Board member and its then-largest shareholder, Bill Ackman of the prominent Pershing Square hedge fund, specifically requested Valeant's management to "come clean" regarding Philidor.  ¶¶291, 454.  There would be nothing to "come clean" about if all facts related to the fraud had already been disclosed to the market.  Indeed, as alleged, additional subsequent disclosures further demonstrate that the full truth was not known by October 30, 2015, and new information was revealed to the market after that date that caused Valeant's stock price to decline by further material amounts.  For example:

- On March 15, 2016, it was first revealed that Valeant was reducing its 2016 financial guidance, which the Company attributed to, among other things, $51.3 million in wind down and $79 million in impairments charges related to Philidor.  ¶465.  In response to this news, the price of Valeant's stock dropped by over 50%, which analysts attributed to these revelations.  ¶466.

- On June 7, 2016, it was first revealed through a press release and conference call that Valeant had incurred massive losses in its 1Q16 financial results.  Valeant further lowered its 2016 guidance, citing the loss of Philidor refill sales revenues.  ¶467.  In response to this news, the price of Valeant's stock dropped by nearly 15%, which analysts attributed to these revelations.  ¶468.

- On August 10, 2016, it was first revealed that the DOJ had launched a criminal investigation concerning Valeant's defrauding of insurers by hiding its relationship with Philidor and for Valeant's deceptive business practices used to sell Valeant drugs.  ¶469.  In response to this news, the price of Valeant's stock dropped by over 10%, which analysts attributed to these revelations.  ¶470.

These additional revelations, which relate directly to Defendants' misrepresentations and omissions, were not known before October 30, 2015, and caused further losses for investors, including the Direct Action Plaintiffs.[6]

---

[6] *See DVI*, 2010 WL 3522090, at *6.  As detailed in the Complaint, there were additional revelations on November 4, 2015, November 10, 2015, November 16, 2015, December 17, 2015, February 19, 2016, February 22, 2016, February 28, 2016, March 15, 2016, June 7, 2016, and August 10, 2016.  This series of new corrective disclosures further revealed the truth of Defendants' fraud and its impacts.  *See* ¶¶291-329.

The cases that Defendants attempt to rely upon, if anything, undermine their "truth-on-the-market" defense and are otherwise easily distinguishable.  For example, in *Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000), the Third Circuit vacated the dismissal of a securities fraud action, "disagree[d]" with defendants' challenges to loss causation at the pleading stage, and held that plaintiffs had adequately pled that an alleged corrective disclosure continued to "misrepresent [the company's] financial condition."  223 F.3d at 181, 186-87.  Equally misplaced is Defendants' reliance on *Lovallo v. Pacira Pharms., Inc.*, 2015 WL 7300492 (D.N.J. Nov. 18, 2015), and *In re Discovery Labs. Sec. Litig.*, 2006 WL 3227767 (E.D. Pa. Nov. 1, 2006).  In *Lovallo*, unlike here, the "Plaintiff d[id] not specifically allege that Defendants hid their aggressive marketing practices from investors" and instead conceded that the "true disclosures" were made public before the alleged corrective disclosures.  2015 WL 7300492, at *8-10.  Similarly, in *Discovery Labs*, "Plaintiffs contend[ed] that . . . the information was publicly available" before the alleged corrective disclosures.  2006 WL 3227767, at *11.  Here, in contrast, information was first revealed after October 30, 2015, and had never been previously disclosed to investors prior to the corrective disclosure dates.[7]

In sum, Defendants have offered no compelling reason for this Court to depart from its Order in the Class Case, and to find as a matter of law and at this early stage that the "truth was revealed" by October 30, 2015.

---

[7] Defendants also cite *Merck*, but in that case the alleged disclosure had "no negative effect on Merck's stock."  *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005).  Here, by contrast, the stock price declines corresponding to the corrective disclosures are amply alleged. *See* ¶¶442-72.

###### B.     Defendants' Challenges To The Section 18 Claims Fail

Defendants next concede that Plaintiffs have adequately pled all elements of their claims under Section 18 of the Exchange Act, with the exception of the element of "reliance."  Valeant Motion at 7-11.  In pleading reliance under Section 18 of the Exchange Act, plaintiffs must allege "actual reliance on specific statements contained in the SEC filing at issue."  *Able Labs*, 2008 WL 1967509, at *26 (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 283 (3d Cir. 2006)).  Plaintiffs have done exactly that and, as further discussed below, amply satisfied the pleading requirements for a Section 18 claim.

Plaintiffs specifically identified in their Direct Action Complaints the misstatements and material omissions in Valeant's 2013 and 2014 Forms 10-K that they relied upon – namely, the Company's year-end reports and audited financial statements, including its reported revenues and related internal control certifications.  *See, e.g.*, ¶¶174-75, 188-89, 208, 218, 258, 339-40, 359, 480-81.  The Complaints further identified who made the investment decisions for each of the Plaintiffs.  *See, e.g.*, ¶¶478-79.  The Complaints provide further facts about the investment strategy used by the Plaintiffs.  ¶478.  The Complaints also specifically state that Plaintiffs and/or their investment advisors read the 2013 and 2014 Forms 10-K at issue on or about February 28, 2014, and February 25, 2015, respectively, and directly relied on the audited financial statements contained therein and Defendants' false attestations regarding the effectiveness of the Company's internal financial and disclosure controls when making their investment decisions.  ¶481.  The Direct Action Complaints additionally allege a causal nexus between the security purchases and actual reliance.  ¶¶477-89.  Nothing more is required at this stage.

Courts in this Circuit have consistently sustained Section 18 claims based on virtually identical allegations of reliance.  For example, in *Able Labs*, plaintiff brought claims under Section 18 of the Exchange Act and, as here, identified the alleged misstatements and alleged that "the

statement[s] were read and relied upon in connection with the purchase of [defendant's] securities." *In re Able Labs Sec. Litig.*, 2008 WL 1967509, at \*26 (D.N.J. 2008). The Honorable Joseph A. Greenaway, Jr., relying on the Third Circuit's opinion in *Suprema*, found these allegations sufficient to state a Section 18 claim, without more. As Judge Greenaway explained, "even applying the heightened pleading standard of Fed. R. Civ. P. 9(b) to this claim under § 18, Plaintiff has pled adequately a violation by identifying specific statements and pleading actual reliance on those statements." *Id.* (citing *Suprema*, 438 F.3d at 283).

Similarly, in *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666 (E.D. Pa. 2004), the court found that plaintiffs adequately pled "actual reliance" for their Section 18 claim where they alleged the misstatements at issue and plaintiffs' actual reliance. *Id.* at 678, 685. In addition, in *Zazzali v. Alexander Partners, LLC*, 2013 WL 5416871 (D. Del. Sept. 25, 2013), the District Court found that plaintiffs satisfy the standard for pleading "actual reliance" in this Circuit where, as in this case, they "identif[y] the specific statements at issue and plead that the investors relied on those particular misrepresentations." *Id.* at \*9 n.12.

As these courts recognized in rejecting Defendants' contention that yet further detail is required at the pleading stage, "[r]equiring plaintiffs to link particular misrepresentations with particular trades in their allegations of direct reliance would impose additional burdens without significantly improving the quality of notice to defendants." *Argent*, 315 F. Supp. 2d at 678; *see WM High Yield Fund v. O'Hanlon*, 2005 WL 6788446, at \*11 (E.D. Pa. May 13, 2005) (agreeing with *Argent* and holding that the complaint need not "link specific misstatements to specific securities purchases in order to demonstrate reliance").

Ignoring these authorities, Defendants attempt to rely upon readily distinguishable cases that, if anything, further demonstrate the adequacy of Plaintiffs' reliance allegations. Defendants

first attempt to rely upon *Suprema*, 438 F.3d 256, but in that case, unlike here, plaintiffs only "allege[d] that they relied [on the] ***documents*** that contained misstatements" and failed to allege "reliance on the ***specific misrepresentations*** themselves." *Id*. at 283. Here, unlike in *Suprema*, Plaintiffs detailed the specific misrepresentations that they relied on, including the Company's audited financial statements and attestations regarding the effectiveness of Valeant's internal financial and disclosure controls. *See* ¶¶473-89. Defendants also attempt to rely upon *Witriol v. Conexant Sys. Inc.*, 2006 WL 3511155 (D.N.J. Dec. 4, 2006). But in that case, it was the failure to identify *any* false statements that led to dismissal – not a failure to plead additional details about the transactions. *Witriol*, 2006 WL 3511155, at *7 (dismissing Section 18 claim where "[n]o specific false statements are identified"). In contrast, Plaintiffs here have identified with particularity the specific false and misleading statements and omissions that they relied upon when purchasing the Company's common stock. *See, e.g*., ¶¶174-75, 188-89, 208, 218, 258, 339-40, 359, 480-81.

Moreover, the two out-of-Circuit decisions on which Defendants attempt to rely are inconsistent with the majority view, including recent decisions from within the Second Circuit. For example, in *Maverick Fund, L.D.C. v. Comverse Tech.*, 801 F. Supp. 2d 41 (E.D.N.Y. 2011), plaintiffs alleged specific misstatements and that plaintiffs "read and/or listened to and relied upon the defendants' false and misleading statements before investing" in defendants' securities. *Id*. at 55. The court found these allegations of direct reliance sufficient "for purposes of surviving a motion to dismiss," and rejected defendants' requests for further detail. *Id*. at 54-55 (explaining that where "plaintiffs provide ample details concerning which statements are alleged to be fraudulent and why," plaintiffs "are not required to plead the specific details of each purchase and sale of . . . stock during the relevant period"). Likewise, in *In re Petrobras Sec. Litig.*, 152 F.

Supp. 3d 186 (S.D.N.Y. 2016), plaintiffs similarly identified the misstatements and alleged that they relied upon the misstatements when making their investment decisions.   In denying defendants' motion to dismiss, Judge Rakoff rejected defendants' assertion that the complaint must "tie specific misstatements to specific transactions in securities." *Id.* at 196.   As Judge Rakoff explained, "such specificity is not necessary for a §18 claim to survive a motion to dismiss," particularly when, as here, "the relevant period is so extensive and plaintiffs allege . . . misstatements and their relevance with such particularity." *Id.*; *see also Transit Rail, LLC v. Marsala*, 2007 WL 2089273, at *8 (W.D.N.Y. July 20, 2007) ("To state a claim under this section, the plaintiff must allege that (1) the defendant made a false or misleading statement, (2) the statement was contained in a document 'filed' pursuant to the 1934 Act or any rule or regulation thereunder, (3) reliance on the false statement, and (4) resulting loss to the plaintiff.").

In sum, the Direct Action Plaintiffs have satisfied the pleading requirements for their Section 18 claims.

**C.   Defendants' Additional Challenge To The BloombergSen Plaintiffs' Section 18 Claims Fails**

Defendants next make an additional, erroneous factual challenge to the Section 18 claim brought by the BloombergSen Plaintiffs.   Valeant Motion at 11-12.   According to Defendants, the BloombergSen's Plaintiffs' Section 18 claim should be dismissed because it is "impossible." *Id.* But Defendants' claims of "impossibility" ring hollow, as they are based on a misreading of the BloombergSen Complaint.   Contrary to Defendants' say-so, the BloombergSen Plaintiffs' Section 18 claim does not concern purchases of Valeant securities *before* February 2015.   BloombergSen Complaint, Case No. 16-cv-07212, ECF No. 1, ¶¶466-67.   Rather, the BloombergSen Plaintiffs purchased the Valeant securities at issue *after* Defendants' filing of their false and misleading Form 10-K on February 25, 2015. *Id.*  ¶467.   The BloombergSen Complaint makes clear that,

after reading the false and misleading statements in the Form 10-K, the BloombergSen Plaintiffs relied on those statements in purchasing Valeant securities. *Id*. Accordingly, it is not "impossible" that the BloombergSen Plaintiffs read and relied upon Defendants' 2014 Form 10-K when they made relevant purchases.[8]

Similarly without merit and based on a misreading of the BloombergSen Complaint is Defendants' assertion that the BloombergSen Plaintiffs' Section 18 claims are barred by Section 18's three-year statute of repose. Valeant Motion at 11-12. The purchases that are related to the BloombergSen Plaintiffs' Section 18 claim occurred after the 2014 Form 10-K was filed on February 25, 2015, and the BloombergSen Plaintiffs filed suit on October 13, 2016 – less than two years later, and well within Section 18's three-year statute of repose. Accordingly, the BloombergSen Plaintiffs' claims are timely.

## D.   Defendant Schiller's Duplicative Arguments Fail

In his motion, Defendant Schiller states that "out of respect for the preservation of judicial resources" and "in order to avoid duplicative briefing," his motion presents only a perfunctory argument that the Direct Action Complaints' allegations of his scienter, and the false and misleading nature of his statements and omissions, are insufficient. Schiller Motion at 2. Defendant Schiller has already raised, and the Court has already rejected, Schiller's attempted

---

[8] Defendants' cited cases are irrelevant. For example, Defendants cite *Gannon v. Cont'l Ins. Co.*, 920 F. Supp. 566 (D.N.J. 1996), and *Dexia SA/NV v. Deutsche Bank AG*, 2013 WL 98063 (S.D.N.Y. Jan. 4, 2013), but neither of those holdings regards Section 18 claims. Defendants cite *Pension Comm. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 629 & n.144 (S.D.N.Y. 2009), but that case concerned a motion for summary judgment, not the pleading standards for a Section 18 claim.

arguments here.  Because the Direct Action Complaints and the Class Action Complaint set forth the same operative allegations, Defendant Schiller's motion should be denied.[9]

The Direct Action Complaints provide great specificity as to Schiller's false and misleading statements, and his scienter.  Schiller, Valeant's CFO and Executive Vice President, was one of the key executives that made the determination to publicly attribute Valeant's financial performance to sales volumes caused by innovative marketing techniques, rather than Valeant's fraudulent tactics.  ¶¶199, 207.  Schiller signed all quarterly and annual reports prior to 2Q15 which claimed Valeant's products "are distributed by third parties over which we have no or limited control."  ¶¶158-59, 166, 168, 175-76, 181, 195.  Schiller further reviewed, approved, and signed the 2013 and 2014 Forms 10-K.  ¶¶174, 208.

Schiller erroneously asserts that "statements attributed to [him] did not even address the matters Valeant allegedly concealed from the market."  Schiller Motion at 1.  In truth, Defendant Schiller, along with Defendant Pearson, touted the Company's innovative non-traditional acquisitions strategy as driving growth for the Company, withholding the truth regarding Valeant's business practices from investors.  *See, e.g.*, ¶¶164, 365.  For example, Defendant Schiller, along with the other Defendants, gave a slide presentation in response to Company disclosures that said, "[w]e do not own or control Philidor," "Philidor employees do not report to Valeant," and "Philidor is independent."  ¶246.  The 2014 Form 10-K, which Schiller signed, contained further misleading statements that, for instance, "our products offer not only medical benefits but also cost advantages as compared with other forms of care."  ¶208.  Schiller further signed the SOX certifications on behalf of Valeant, and those statements thus may be properly attributed to him.  *E.g.*, ¶160; *WM*

---

[9] Schiller also duplicates and relies upon the motions to dismiss filed by Valeant in the Direct Actions, which fail for the reasons discussed above.

*High Yield Fund*, 2005 WL 6788446, at *8 ("While there is some question whether signatories to financial statements can be held to have adopted that document as a statement, at this stage of litigation the Court will permit claims to proceed on that basis").

The Direct Action Complaints also more than adequately allege Defendant Schiller's scienter. Schiller's scienter is demonstrated by his role as CFO and responsibility for certifying and signing Valeant's financial statements, his certification of Valeant's internal controls, and the specificity of his false and misleading statements as to Valeant's business practices. *See, e.g.*, ¶¶36, 135, 160-61, 166. Further, Schiller was personally involved in Valeant's non-traditional business strategy based upon acquiring and selling existing drugs through Philidor. *See, e.g.*, ¶¶63, 164, 186-87. For example, the Direct Action Complaints specify that Schiller served as an authority on the subjects of Philidor and Valeant's pricing practices. *See, e.g.*, ¶¶366-67. Schiller also participated in pricing meetings and visits of Philidor facilities, signed the agreements with Philidor, and spoke about the purported advantages of the AF program. *See, e.g.*, ¶¶368-75. Schiller also refuted pertinent claims about Valeant's business model and business practices when speaking to investors. ¶¶310, 365.

In response to these well-pled allegations, Schiller contends that the Direct Action Complaints should be dismissed because there are supposedly insufficient allegations of motive. Schiller Motion at 1. But Plaintiffs are not required to allege motive. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007). Moreover, as the Court held in the Class Case, "[t]he driving motive for facilitating the scheme . . . was Valeant's unusual compensation structure, which provided incredibly rich compensation packages based on achieving increasingly challenging performance goals, backed by the threat of termination," and "Schiller's compensation was . . . tied to increasing share price." Order at 16-17.

In sum, the Court should reject Schiller's arguments for the same reasons they were rejected in the Class Case. *Id*. at 16-17 (citing Schiller's alleged false statements and explaining that "Pearson and Schiller made key admissions and provided misleading testimony in Congressional hearings" and that "Schiller's compensation was . . . tied to increasing share prices").

### E.   **Defendant Carro's Duplicative Arguments Fail**

Defendant Carro's motions attempt to challenge the sufficiency of the Direct Action Plaintiffs' allegations that Defendant Carro (i) made false or misleading statements; and (ii) acted with scienter.  As discussed below, the Court has already rejected these same arguments in the Class Case, and Carro presents no reason to diverge from the Court's well-reasoned findings.

### 1.   **Defendant Carro's Challenges To Falsity Fail**

To plead falsity, a plaintiff need only identify a plausibly material false or misleading statement or omission, identify the defendant(s) responsible for the statement or omission, specify the date of the statement or omission, and state the reasons why the statement is false, misleading or omitted material facts.  *See* 15 U.S.C. § 78u-4(b)(1); *In re Schering-Plough Corp./Enhance Sec. Litig.*, 2009 WL 2855457, at *2 (D.N.J. Sept. 2, 2009).  In considering whether a complaint adequately pleads falsity, all inferences are drawn in the plaintiff's favor.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011).  Moreover, as courts in this Circuit recognize, "[s]ome statements, although literally accurate, can become through their context and manner of presentation, devices which mislead investors."  *Merck*, 2011 WL 3444199, at *9.  Indeed, "[a]ccurately depicting successful financial performance, but attributing the performance to the wrong source, is misleading under the securities laws."  *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415-16 (D. Del. 2009).

The Carro Motion repeats the same falsity challenges made in her prior motion to dismiss the Class Action Complaint.  *Compare* Carro Class Motion (*Valeant*, Case No. 15-cv-07658-MAS-LHG, ECF No. 166 (June 13, 2016)  at 4 *with* Carro Motion at 5-6.  Defendant Carro's arguments fail here for the same reasons that they failed in the Class Case.

First, contrary to Defendant Carro's assertion, the Direct Action Complaints specifically identify the misleading statements and omissions made by Defendant Carro.  As stated in the Complaints, during an investor conference on October 26, 2015, Defendant Carro assured investors that, as of year-end 2014, "Philidor is not considered to be material to Valeant's business for reporting purposes" and that, for the first two quarters of 2015, Philidor "had not been material to the consolidated financial statements."  ¶250.  In truth, Philidor and Philidor-derived revenue were highly material to Valeant's financial condition, and the Company was forced to restate its financials after disclosing Philidor.  ¶309.  Moreover, Defendant Carro's statements why Philidor was purportedly not "material" were false and misleading because they concealed that Philidor was not independent, but rather was formed by and completely dependent upon Valeant, and that Valeant's revenue increases were, in fact, the result of its deceptive business practices.  ¶152.

Second, in addition to the October 26, 2015 statements described above that Carro made herself, the misstatements and omissions made by her fellow executives during the investor presentations on October 26, 2015, and November 10, 2015, can also be properly attributed to her. As the Supreme Court held in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011), liability under the Exchange Act attaches to the maker of the misstatements and those to whom the statements may be "attributed."  *Id.* at 151; *Merck*, 2011 WL 3444199, at *9.

Here, as this Court has already found, the Company's presentations and releases contained statements properly attributable to Defendant Carro.  *See* Order at 24 (finding that the Complaint

adequately "attribute[d the] purported material misstatements or omissions" to Carro, which meets "the standard set forth in *Janus*").  Defendant Carro oversaw Valeant's accounting practices and certified financial figures associated with Philidor.  ¶¶40, 135.  Defendant Carro also determined how to book revenues attributed to Philidor's sales.  *See, e.g.*, ¶¶385, 391, 393.  The financial figures cited in these presentations were the same or substantially similar to those Carro certified.  ¶¶250, 338-40, 353.  During a slide presentation responding to the Philidor disclosures, which misleadingly represented that "[p]rescriptions through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates, and more cash pay scripts in Philidor than in retail and other channels," Carro was present alongside other Valeant executives, endorsed the presentation, and never disagreed with or corrected the presentation.  ¶¶246, 250.  Carro also publicly confirmed the accounting statements made in this presentation.  ¶250.

Under *Janus*, these false statements can be properly attributed to Carro because they set forth the views and positions of Valeant's executive management, and Carro played a key role in determining the financial figures presented therein.  *See* Order at 24; *see also*, *e.g.*, *In re Merck & Co. Inc. Sec. Derivative & ERISA Litig.*, 2013 WL 2395035, at *6 (D.N.J. May 29, 2013) (explaining that *Janus* "hold[s] that explicit or implicit attribution of a statement to a party . . . demonstrates that the party made the statement"); *Glickenhaus*, 787 F.3d at 427 (explaining that whether a statement can be attributed to an executive is "an inherently fact-bound inquiry"); *In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012) (complaint adequately alleged defendants were liable for statements in "press releases, because they 'were involved in drafting, reviewing and/or disseminating the false and misleading financial statements that were issued . . ., approved or ratified these statements and, therefore, adopted them as their own.'").  For

this additional reason, Defendant Carro's liability for false and misleading statements and omissions is more than adequately alleged.

### 2.  Defendant Carro's Challenges To Scienter Fail

Defendant Carro's scienter contentions are also a nearly verbatim repetition of the same arguments that the Court already rejected in the Class Case.  *Compare* Carro Class Motion at 8-15, *with* Carro Motion at 11-17.  Defendant Carro's previously-rejected argument should be rejected again here for the same reasons.

To satisfy the scienter pleading requirement, a plaintiff need not demonstrate actual knowledge; rather, a showing of recklessness suffices.  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999).  Scienter may be established through defendants' "knowledge of facts or access to information contradicting their public statements" because such evidence shows that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001).  Moreover, the Supreme Court has made clear that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences'" and that allegations of scienter must be assessed "holistically," and not in isolation.  *Tellabs*, 551 U.S. at 324.  Further, the Third Circuit has likewise emphasized that, to "promote[] the policy objectives of discouraging deliberate ignorance and preventing defendants from escaping liability solely because of the difficulty of proving conscious intent  to commit fraud," courts must be careful to avoid imposing too strict a scienter standard. *Advanta*, 180 F.3d at 535.

Here, Defendant Carro has already raised, and the Court has already rejected, the argument that investors have not adequately pled scienter.  In moving to dismiss the Class Action Complaint, Defendant Carro similarly argued that Plaintiffs' allegations were purportedly too ambiguous and

relied upon Carro's corporate position to show scienter.  *Compare* Carro Class Motion at 8-14, *with* Carro Motion at 13 (making virtually identical scienter challenge).  In rejecting Defendant Carro's attempted argument, the Court found that the Class Action Complaint "adequately pleads scienter by alleging: (1) the [] Defendant's direct roles in deceptive practices; (2) the [] Defendants' senior roles, specificity of their statements, and by way of the Core Operations Doctrine; [] (3) the [] Defendants' pattern of denials and subsequent admissions; (4) the [] Defendants' failure to pursue remedies; (5) Valeant's restatements and material weaknesses in internal controls; (6) volume of executive and director departures; and the (7) [] Defendants' unique compensation and Valeant's dependence on acquisitions."  Order at 20.  Because Plaintiffs have set forth the same operative allegations pled in the Class Case with respect to Defendant Carro, her motion should again be denied.

As with the Class Action Complaint, the Direct Action Complaints provide great specificity in their allegations as to Defendant Carro's scienter.  Plaintiffs detail how Carro was directly engaged in improper accounting through her role as Valeant's Corporate Controller.  ¶40.  Defendant Carro, along with the other executives, defended the false accounting figures, despite knowing their falsity.  ¶¶135-36, 246.  Further when a report questioned whether Valeant was inflating revenue through Philidor, Defendant Carro publicly defended Valeant's improper accounting.  ¶¶383, 385.  The Complaints further detail how, on March 21, 2016, Valeant admitted that Defendant Carro had engaged in "improper conduct" and placed her on administrative leave in light of the Company's accounting restatement.  ¶385.  As made clear in the Direct Action Complaints, Defendant Carro's improper conduct included providing inaccurate information to auditors and the Audit Committee, including booking the same revenues twice and recording revenues for selling products internally, as well as making misstatements and omitting material

facts when speaking with investors.  *See, e.g.*, ¶¶250, 391-92, 415.  Under well-established law in this Circuit, Carro either knew, or was reckless in not knowing, the truth surrounding Valeant's fraudulent practices pertaining to Philidor.  This is more than enough at the pleading stage to satisfy Plaintiffs' burden to allege scienter.  *See Inst'l Inv'rs Grp. v. Avaya*, 564 F.3d 242, 267 (3d Cir. 2009).[10]

### F.    Defendant Jorn's Duplicative Argument Fails

Like Defendant Carro, Defendant Jorn has already raised, and the Court has already rejected, her contention that she did not act with scienter.  In moving to dismiss the Class Action Complaint, Defendant Jorn also erroneously asserted that Plaintiffs relied upon "group pleading" to show scienter and did not list allegations specifically attributable to Defendant Jorn.  *Compare Valeant*, Case No. 15-cv-07658-MAS-LHG, ECF Nos. 169, 169-1 (Sept. 13, 2016) ("Jorn Class Motion") at 4-9, *with* Jorn Motion at 4 (making identical argument).  The Court rejected Jorn's argument, recognizing that investors have adequately alleged each of Defendants' individual scienter, including Defendant Jorn's.  Order at 19-22.  Because Plaintiffs have set forth in the Direct Action Complaints the same operative allegations as in the Class Case, Defendant Jorn's motions should be denied again.

---

[10] The cases cited by Defendant Carro are easily distinguishable.  Carro cites *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 549 (D.N.J. 2010), and *In re Milestone Sci. Sec. Litig.*, 103 F. Supp. 2d 425, 470 (D.N.J. 2000), where plaintiffs alleged only an executive's position within a company as proof of scienter.  Here, Plaintiffs do not allege that Defendant Carro's corporate position alone demonstrates scienter; rather, Plaintiffs have alleged myriad facts raising a strong inference of her scienter, including, among other things, Defendant Carro's integral role and day-to-day involvement in the underlying misconduct.  Defendant Carro further cites *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 595 (D.N.J. 2005), but in that case plaintiffs' lone scienter evidence was unrelated to the alleged misrepresentation.  Here, in contrast, Plaintiffs amply describe the relationship between their evidence to the misrepresentations made to investors.

Moreover, although Jorn suggests in her motion that she purportedly lacked knowledge of the fraudulent pricing practices and the concealment of the Company's relationship with Philidor (Jorn Motion at 4-5), the Direct Action Complaints' detailed allegations belie these assertions and provide great specificity as to Defendant Jorn's scienter.  Jorn, who served as the head of Valeant's U.S. Gastrointestinal and Dermatology Divisions, was directly responsible for many of Valeant's top-selling drugs, including Jublia, a dermatology drug which was sold in immense quantities through Philidor.  *See* ¶¶14, 38, 414.  Through that role, Jorn had first-hand knowledge of Philidor and Valeant's network of pharmacies.  *See, e.g.*, ¶185.  Accordingly, Defendant Jorn knew or should have known that Valeant was misleadingly referring to these pharmacies as "specialty pharmacies" even though they did not meet the criteria established for this characterization.  ¶¶86-87.

Defendant Jorn was also specifically involved in many of the improper copay practices that Valeant relied upon to increase its sales and drug prices.  ¶¶129-30.  Defendant Jorn met with Defendant Kellen and district managers to promote Philidor's growth.  ¶377.  Through these efforts, Defendant Jorn was responsible for restoring the profitability of several of Valeant's dermatology products previously plagued by weak sales.  ¶185.  Accordingly, on or about March 2, 2016, it was reported that Defendant Jorn was "leaving the company effective immediately," further strengthening the inference of scienter.  ¶414.

Defendant Jorn's cited cases do not defeat Plaintiffs' detailed scienter allegations.  For example, Defendant Jorn cites *Advanta*, 180 F.3d 525, in which the court held that a defendant's corporate position ***alone*** does not establish scienter.  However, Plaintiffs are not asserting that this Court should find scienter based on Jorn's corporate position ***alone***; rather, Defendant Jorn's corporate position and responsibility over the drug distribution channels are factors that, taken

together with the numerous other factors detailed in the Direct Action Complaints, collectively demonstrate scienter.  *See, e.g.*, ¶377.  Similarly, Defendants cite *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *20 (D.N.J. Apr. 27, 2017), for the notion that alleging Defendant Jorn's sudden and unexpected departure from Valeant is, ***standing alone***, insufficient to adequately allege scienter.  But Plaintiffs are not asserting that Jorn's sudden departure ***alone*** raises a strong inference of scienter; rather, it is an additional factor, along with many others detailed in the Direct Action Complaints, which strengthen the scienter inference under the requisite "holistic review."  *See Advanta*, 180 F.3d at 535.

In sum, Defendant Jorn has offered no reason for this Court to reconsider its finding that investors have adequately alleged Jorn's scienter under the Exchange Act.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motions to Dismiss should be denied in their entirety.  If, however, the Court grants any part of any motion, Plaintiffs respectfully request leave to amend under Federal Rule of Civil Procedure 15.

Dated: July 28, 2017                                      Respectfully submitted,

**CARELLA, BYRNE, CECCHI,**                    **BERNSTEIN LITOWITZ BERGER**
**OLSTEIN, BRODY & AGNELLO, P.C.**         **& GROSSMANN LLP**

 /s/ James E. Cecchi                                         /s/ Blair A. Nicholas
James E. Cecchi                                         Blair A. Nicholas (*pro hac vice*)
5 Becker Farm Road                                   Jonathan D. Uslaner (*pro hac vice*)
Roseland, NJ 07068                                    David Kaplan (*pro hac vice*)
Tel: (973) 994-1700                                    Brandon Marsh (*pro hac vice*)
Fax: (973) 994-1744                                   12481 High Bluff Drive, Suite 300
JCecchi@carellabyrne.com                        San Diego, CA 92130
                                                                 Tel:    (858) 793-0070
                                                                 blairn@blbglaw.com
                                                                 jonathanu@blbglaw.com
                                                                 davidk@blbglaw.com
                                                                 brandon.marsh@blbglaw.com

                                                                 *Counsel for Plaintiffs*

## APPENDIX A

Corresponding Paragraph Citations Among Direct Action Complaints

| *Equity Trustees Complaint* | *BloombergSen Complaint* | *Principal Funds Complaint* | *T. Rowe Complaint* |
|---|---|---|---|
| ¶¶2-3 | ¶¶2-3 | ¶¶2-3 | ¶¶2-3 |
| ¶¶8-12 | ¶¶8-12 | ¶¶8-12 | ¶¶8-12 |
| ¶¶10-12, 57 | ¶¶10-12, 48 | ¶¶10-12, 49 | ¶¶10-12, 47 |
| ¶¶14, 38, 414 | ¶¶14, 29, 400 | ¶¶14, 30, 406 | ¶¶14, 28, 411 |
| ¶36 | ¶27 | ¶28 | ¶26 |
| ¶40 | ¶31 | ¶32 | ¶30 |
| ¶63 | ¶54 | ¶55 | ¶55 |
| ¶¶86-87 | ¶¶77-78 | ¶¶78-79 | ¶¶76-77 |
| ¶107 | ¶98 | ¶99 | ¶97 |
| ¶¶129-30 | ¶¶120-21 | ¶¶121-22 | ¶¶119-20 |
| ¶¶135-36, 246 | ¶¶126-27, 232 | ¶¶127-28, 238 | ¶¶125-26, 243 |
| ¶152 | ¶143 | ¶144 | ¶149 |
| ¶¶158-61, 166, 168, 175-76, 181, 195 | ¶¶149-52, 157, 159, 166-67, 172, 186 | ¶¶150-53, 158, 160, 167-68, 173, 187 | ¶¶155-58, 163, 165, 172-73, 178, 192 |
| ¶¶164, 365 | ¶¶155, 351 | ¶¶156, 357 | ¶¶161, 362 |
| ¶¶174, 208 | ¶¶165, 199 | ¶¶166, 200 | ¶¶171, 205 |
| ¶¶174-75, 188-89, 208, 218, 258, 339-40, 359, 480-81 | ¶¶165-66, 179-80, 199, 205, 244, 325-26, 345, 466-67 | ¶¶166-67, 180-81, 200, 210, 250, 331-32, 351, 472-73 | ¶¶171-72, 185-86, 205, 215, 255, 336-37, 356, 477-78 |
| ¶185 | ¶176 | ¶177 | ¶182 |
| ¶186 | ¶177 | ¶178 | ¶183 |
| ¶¶199, 207 | ¶¶190, 198 | ¶¶191, 199 | ¶¶196, 204 |
| ¶208 | ¶199 | ¶200 | ¶205 |
| ¶246 | ¶232 | ¶238 | ¶243 |

## APPENDIX A

Corresponding Paragraph Citations Among Direct Action Complaints

| Equity Trustees Complaint | BloombergSen Complaint | Principal Funds Complaint | T. Rowe Complaint |
|---|---|---|---|
| ¶¶250, 391-92, 415 | ¶¶236, 377-78, 401 | ¶¶242, 383-84, 407 | ¶¶247, 388-89, 412 |
| ¶¶259-329, 442-72 | ¶¶245-315, 428-58 | ¶¶251-321, 434-64 | ¶¶256-326, 439-69 |
| ¶¶291, 454 | ¶¶277, 440 | ¶¶283, 446 | ¶¶288, 451 |
| ¶¶291-329 | ¶¶277-315 | ¶¶283-321 | ¶¶288-326 |
| ¶¶309-11, 454 | ¶¶295-97, 440 | ¶¶301-03, 446 | ¶¶306-08, 451 |
| ¶318 | ¶304 | ¶310 | ¶315 |
| ¶¶333-59 | ¶¶319-45 | ¶¶325-51 | ¶¶330-56 |
| ¶¶360-441 | ¶¶345-427 | ¶¶352-433 | ¶¶357-438 |
| ¶¶365-75 | ¶¶351-61 | ¶¶357-67 | ¶¶362-72 |
| ¶377 | ¶363 | ¶369 | ¶374 |
| ¶383 | ¶369 | ¶375 | ¶380 |
| ¶385 | ¶371 | ¶377 | ¶382 |
| ¶¶391, 393 | ¶¶377, 379 | ¶¶383, 385 | ¶¶388, 390 |
| ¶414 | ¶400 | ¶406 | ¶411 |
| ¶415 | ¶401 | ¶407 | ¶412 |
| ¶¶442-72 | ¶¶428-58 | ¶¶434-64 | ¶¶439-69 |
| ¶¶462-70 | ¶¶448-54 | ¶¶454-62 | ¶¶459-67 |
| ¶¶473-98 | ¶¶459-77 | ¶¶465-83 | ¶¶470-92 |
| ¶¶477-89 | ¶¶463-69 | ¶¶469-75 | ¶¶474-84 |
| ¶¶478-79 | ¶¶464-65 | ¶¶470-71 | ¶¶475-76 |
| ¶¶480-88 | ¶¶466-67 | ¶¶470-73 | ¶¶475-82 |